# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
| Rafik Benaissa, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER GRANTING DEFENDANTS'** |
| v. | ) | **MOTION TO DISMISS** |
| | ) | |
| Trinity Health, Trinity Hospital, | ) | |
| Trinity Kenmare Community Hospital, | ) | |
| and Trinity Hospital - St. Joseph's, | ) | Case No: 4:15-cv-159 |
| | ) | |
| Defendants, | ) | |
| | ) | |

Before the Court is the Defendants Trinity Health, Trinity Hospital, Trinity-St. Joseph's, and Trinity Kenmare Community Hospital's "Motion to Dismiss for Failure to State a Claim" filed on December 21, 2016. See Doc. No. 37. Rafik Benaissa, as relator, filed a response in opposition to the motion on January 30, 2017. See Doc. No. 39. The Defendants replied on February 10, 2017. See Doc. No. 40. For the reasons set forth below, the Defendants' motion is granted.

## I.  BACKGROUND

Dr. Rafik Benaissa filed this *qui tam* action against Trinity Health, Trinity Hospital, Trinity Kenmare Community Hospital, and Trinity Hospital – St. Joseph's,[1] and John Does 1-100 on November 6, 2015. See Doc. No. 3. On November 14, 2016, Dr. Benaissa filed an amended complaint.[2] See Doc. No. 34. In the amended complaint, Dr. Benaissa alleges Trinity Health

---

[1] Trinity Health, Trinity Hospital, Trinity Kenmare Community Hospital, and Trinity Hospital – St. Joseph's are collectively referred to as "Trinity Health."

[2] The amended complaint did not name John Does 1-100 as Defendants. See Doc. No. 34, p. 1.

violated the False Claims Act ("FCA") by submitting false and/or fraudulent claims to the United States. Specifically, Dr. Benaissa alleges violations of 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), 3729(a)(1)(C), and 3729(a)(1)(G) as well as relief from retaliatory actions pursuant to 31 U.S.C. 3730(h) in eight separate causes of action. At the heart of Dr. Benaissa's amended complaint are allegations that Trinity Health violated Stark and Anti-Kickback statutes when Trinity Health over-compensated physicians based upon referrals, with physicians referring patients for and/or conducting unnecessary procedures. Additionally, the amended complaint alleges Trinity Health physicians 'upcoded' – a practice in which a physician bills at a higher than appropriate code level for patient consultations and receives a greater reimbursement through Medicare than the physician would have received billing at a lower code level. Dr. Benaissa also alleges Trinity Health terminated him in retaliation for challenging Trinity Health's compensation system.

Dr. Benaissa brought this action as a relator, in the name of the United States. See 31 U.S.C. § 3730(b)(1). After receipt of a relator's complaint, the United States may elect to intervene and proceed with the action. 31 U.S.C. § 3730(b)(2). The United States declined to intervene in this action on July 12, 2016. See Doc. No. 15. Consequently, Dr. Benaissa now has the "right to conduct the action," subject to the United States reserved right "to order any deposition transcripts, to intervene in this action, for good cause, at a later date, and if, appropriate, to seek the dismissal of the relator's action . . . ." See Doc. No. 15, p. 2.

In the amended complaint, Dr. Benaissa alleges Trinity Health violated the Stark statute and Anti-Kickback statute. Specifically, Benaissa alleges "Trinity Health has engaged in a scheme to pay improper compensation to physicians to induce them illegally to refer patients, including Medicare, Medicaid, and TriCare patients, to Trinity Health hospitals and clinics for inpatient,

outpatient, and ancillary services." <u>See</u> Doc. No. 34, p. 2. Benaissa continues his description of the scheme that violates Stark and Anti-Kickback statutes:

> 22. Physicians with whom Trinity Health has entered into illegal financial relationships refer large volumes of patients, including Medicare and Medicaid patients to Trinity hospitals and clinics in violation of federal law. Trinity has and continues to submit false or fraudulent claims based on these referrals to the United States to obtain millions of dollars in Medicare, Medicaid, and TriCare payments that they were not legally entitled to receive.

> 23. By way of introduction, the department of surgery and the related surgical disciplines in most community hospitals are responsible for substantial annual profit margins generated by the hospital. That fact is true at Trinity Health. Revenues from perioperative services or ancillary revenues related to surgical procedures account for a major portion of annual profits at Trinity Health.

> 24. Trinity Health has recruited and employed surgeons with a focus on employing certain surgical specialists who are more profitable in producing ancillary hospital revenues for perioperative services. Such specialties include orthopedic surgery and interventional cardiology.

> 25. In violation of federal *Stark* laws, Trinity Health has induced and financially rewarded certain employed surgeons based on the volume and value of referrals for surgical procedures and perioperative services such surgeons generate for the hospital system. Trinity Health continued this profiteering scheme even with knowledge that employed surgeons were ordering unnecessary hospital admissions or outpatient visits and performing unnecessary surgeries on patients covered under federal healthcare programs such as Medicare and TriCare. The scheme at Trinity Health represents major violations of federal *Stark* laws and a major threat to the safety and health of patients.

> 26. Trinity Health's scheme to over-compensate employed physicians based on referrals is not limited to surgeons, but extends to other clinicians with substantial referrals to Trinity hospitals and clinics. Trinity Health has compensated their employed physicians at levels to generate massive losses over the last 6 years. Such losses have been more than offset by the revenues from referrals by employed physicians being over-compensated.

<u>See</u> Doc. No. 34, pp. 6-7.

In sum, Dr. Benaissa alleges Trinity's fraudulent scheme rewards physicians for referrals and results in physicians conducting unnecessary surgeries. In the amended complaint, Dr.

Benaissa includes allegations specific to five patients.  See Doc. No. 34, pp. 8-11.  Dr. Benaissa alleges that in February of 2012, another orthopedic surgeon, Dr. Ravindra Joshi, interfered with Dr. Benaissa's treatment of a patient when Dr. Joshi took the patient back to surgery for "another irrigation debridement and supposed 'adjustment' of the external fixator."  Id. at 8.  According to Dr. Benaissa, "the surgery was not indicated as the patient had already received three irrigations and debridements."  Id.  The amended complaint also alleges Dr. Joshi and Dr. Benaissa disagreed about the treatment of an elderly Medicare patient who had recently undergone cardiac bypass and had a minimally displaced shoulder fracture.  Id. at 10.  Dr. Benaissa alleges he was part of a meeting discussing the death of a patient who had undergone hip fracture surgery in December 2014.  Id.  Dr. Benaissa alleges facts specific to a fourth patient, an elderly Medicare patient with a non-displaced fracture of the humerus.  According to the amended complaint, Dr. Benaissa recommended conservative treatment, but Dr. Joshi performed a shoulder surgical fixation, which failed, and a subsequent shoulder replacement, that similarly failed.  Id. at 11.  Last, Dr. Benaissa describes Dr. Joshi's care of a worker's compensation patient who suffered a "segmental femur fracture."  Id.  Dr. Benaissa alleges these types of fractures are usually treated with a reamed nail, but Dr. Joshi did an open reduction, added cables, and performed a bone graft. Dr. Joshi's treatment increased the chances of the patient developing complications.  Id.

Dr. Benaissa's amended complaint includes allegations he notified Trinity Health executives of his concerns about unnecessary surgeries and was eventually terminated as a result. Id. at 7.  Dr. Benaissa alleges he discussed Dr. Joshi's unnecessary surgeries with supervising physicians on several occasions, only to be rebuffed or threatened.  Id. at 10-13.  Dr. Benaissa's amended complaint also contains allegations that a number of other individuals communicated to Dr. Benaissa their thoughts that Dr. Joshi's surgeries were unnecessary, contrary to the standard

of care, disturbing, or concerning.  Dr. Benaissa specifically alleges he received a letter from Dr.

Joshi's full-time nurse that stated:

> "His unnecessary surgeries really concerned me as I finally brought it up to him."
> "He would see a patient and an assessment and MRI would be done, and they would
> simply tell us nurses he does not see anything wrong with this patient, however he
> told us that he wanted to schedule surgery as soon as possible on them because they
> are in pain." "As I confronted him he did not respond and I believe that he thought
> I knew too much information, and wanted to get rid of me." "Recently he has done
> a couple of 'unnecessary' surgeries and the patients have died." "The work
> environment became very hostile as I would get pulled behind closed doors and
> reprimanded for not meeting his quota for the day with patients or having enough
> surgeries scheduled during the week." "Trinity and the DON [Department of
> Nursing] simply covered up all his mistakes and let them go."

See Doc. No. 34, p. 15.  According to the amended complaint, Dr. Joshi's nurse was fired when

she raised her concerns regarding Dr. Joshi's surgeries to Trinity Health's administration.  Id. at

16.

     As a second issue, Dr. Benaissa alleges Trinity Health physicians engaged in "upcoding"

by billing at a level five for patient consults, when billing at a lower level would have been more

appropriate, causing Trinity Health to receive a greater reimbursement through Medicare

compared to the reimbursement Trinity Health would have received had Dr. Joshi billed at a lower

level.  Id. at 17.  Trinity's Chief of Surgery, Dr. Kindy, monitored the codes/levels at which

physicians sought reimbursement through Medicare.   Dr. Benaissa alleges that Dr. Kindy

pressured Dr. Benaissa to up-code his consultations from a level two to at least a level three to

receive greater reimbursement through Medicare.   Id.   Dr. Benaissa alleges Trinity Health

terminated him as a result of his actions challenging the compensation scheme, namely questioning

Dr. Joshi's unnecessary surgeries.  Id. 20-21.

     Trinity Health filed this motion to dismiss pursuant to Rules 8(a), 9(b), and 12(b)(6) on

December 21, 2016.  See Doc. No. 37.  Trinity Health asserts Dr. Benaissa's amended complaint

fails to plead specific, particularized facts in accordance with Rule 8 and 9(b) of the Federal Rules of Civil Procedure to support the allegation Trinity Health violated the FCA by submitting false and/or fraudulent claims to the United States. Dr. Benaissa disagrees and contends the amended complaint outlines details of Trinity Health's fraud, identifying unlawful payments, the parties who received them, and the time periods of the unlawful payments sufficiently to satisfy the contours of Rules 8 and 9(b).

## II.     STANDARD OF REVIEW

Trinity Health moves to dismiss the amended complaint pursuant to Rules 12(b)(6), 9(b), and 8(a) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, a pleading must provide "a short and plain statement of the claim that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). When ruling on motions under either Rule 12(b)(6) or Rule 9(b), the Court accepts the factual allegations in the complaint as true, drawing all reasonable inferences in favor of Dr. Benaissa, as the non-moving party. Drobnak v. Anderson Corp., 561 F.3d 778, 781 (8th Cir. 2008).

Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A plaintiff must show that success on the merits is more than a "sheer possibility." Id. A complaint is sufficient if its "factual content . . . allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Id. The court need not accept legal conclusions or "formulaic recitation of the elements of a cause of action" in the complaint as true. Id. at 681. A complaint does not "suffice if it tenders a naked assertion devoid of further factual enhancement." Ashcroft, 556 U.S. at 678 (2009). The determination of whether a complaint states a claim upon which relief can be granted is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Dismissal will not be granted unless it appears beyond doubt the plaintiff can prove no set of facts entitling the plaintiff to relief. Ulrich v. Pope Cnty, 715 F.3d 1054, 1058 (8th Cir. 2013).

"Because the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b)." United States ex rel. Joshi v. St. Luke's Hospital, Inc., 441 F.3d 552, 556 (8th Cir. 2006). "Rule 9(b)'s 'particularity requirement demands a higher degree of notice than that required for other claims,' and 'is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations.'" Id. (quoting United States ex rel. Costner v. URS Consultants, Inc., 317 F.3d 883, 888 (8th Cir. 2003)). When determining whether a complaint complies with Rule 9(b), the Court must consider whether the complaint states "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff must plead such matters as the time, place and contents of the allegedly false representations, as well as the identity of the person making the representations and what was obtained or given up. Schaller Tel. Co. v. Golden Sky Systems, Inc., 298 F.3d 736, 746 (8th Cir. 2002). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient" to satisfy Rule 9(b). Id. (quoting Commercial Prop. v. Quality Inns, 61 F.3d 639, 644 (8th Cir. 1995)).

## III.    LEGAL DISCUSSION

In the motion to dismiss, Trinity Health contends Dr. Benaissa's amended complaint should be dismissed because he has failed to plead specific, particularized facts to support the allegations Trinity Health defrauded federal healthcare programs in violation of the FCA.  In response to the motion, Dr. Benaissa contends the amended complaint sufficiently states a claim upon which relief can be granted and satisfies Rule 9(b) by stating with particularity the circumstances constituting Trinity Health's violations of the FCA.  The Court begins its analysis of whether the amended complaint satisfies Rules 8 and 9(b) by looking to to the False Claims Act and Anti-Kickback and Stark statutes.

### A.    Anti-Kickback and Stark Statutes and the False Claims Act

Dr. Benaissa alleges Trinity Health violated the Anti-Kickback and Stark statutes by excessively compensating physicians in exchange for referrals for surgical procedures and engaging in upcoding.  The Anti-Kickback statute ("AKS") imposes criminal liability on a defendant who "knowingly or willfully solicits or receives any remuneration" (such as a kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, "in return for referring an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1).  In addition, AKS imposes criminal liability on a defendant who "knowingly and willfully offers or pays any remuneration directly or indirectly, overtly or covertly, in cash or in kind" for a referral.  42 U.S.C. § 1320a-7b(b)(2).  In 2010, Congress amended the AKS to explicitly state that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim" under the False Claims Act.  42 U.S.C. § 1320a-7b(g).

Similarly, the Stark statute, 42 U.S.C. § 1395nn(a), generally prevents a physician who has a financial relationship with an entity from making a referral to that entity for the "furnishing of designated health services for which payment otherwise may be made" and such entity may not present or cause to be presented a claim of payment for designated health services pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a). However, there are numerous exceptions to the application of this general rule. See 42 U.S.C. § 1395nn(b)-(e).

Dr. Benaissa alleges Trinity Health's violations of the Anti-Kickback and Stark statutes caused Trinity Health to submit false certifications to the government for Medicare, Medicaid, and Tricare reimbursement in violation of the False Claims Act. The False Claims Act imposes liability on any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1). Liability under the FCA attaches "not to the underlying fraudulent activity, but to the claim for payment." Costner v. URS Consultants, 153 F.3d 667, 677 (8th Cir. 1998).

## B.     Particularity Requirement of Rule 9(b)

In most cases, detailed factual allegations are not necessary under the Rule 8 pleading standard. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). However, a complaint alleging

violations of the FCA must be pled with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. Joshi, 441 F.3d. at 556. Rule 9(b) provides that a "party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In *United States ex rel. Joshi v. St. Luke's Hospital, Inc.* ("*Joshi*"), the Eighth Circuit addressed whether a relator's complaint satisfied the particularity requirement of Rule 9(b) when the complaint alleged a hospital violated the FCA by submitting false claims to the government. 441 F.3d 552 (8th Cir. 2006).

In *Joshi*, the complaint specifically alleged St. Luke's Hospital requested and received reimbursement from the government for anesthesia services performed by Dr. Bashiti at a higher reimbursement rate when it was entitled only to a lower reimbursement or no reimbursement. The *Joshi* complaint alleged Dr. Bashiti failed to perform pre-anesthetic evaluations and prescribe anesthesia plans; and alleged Dr. Bashiti falsely certified he supervised the work of nurse anesthetists. Id. at 554. According to the amended complaint, St. Luke's Hospital then sought reimbursement for supervised nurse anesthetists' work, when in fact the work was unsupervised. Id. The Eighth Circuit reviewed the complaint in *Joshi* and concluded it "failed to allege with any specificity the particular circumstances" constituting the "alleged fraudulent conduct." Id. at 556. Nonetheless, Joshi contended the complaint satisfied Rule 9(b) because "all the nurse anesthetists' work was illegal" and "every invoice for nurse anesthetist work was fraudulent because no nurse anesthetist was medically supervised or directed." Id. at 556.

The Eighth Circuit ultimately determined Dr. Joshi's allegation that every claim submitted that was fraudulent lacked sufficient "indicia of reliability" because Dr. Joshi was not a member of the billing department and such conclusory allegations were unsupported by any specific details of the fraudulent behavior. Consequently, to enable St. Luke's to adequately respond to Dr. Joshi's

allegation of systematic submission of fraudulent claims, the Eighth Circuit concluded Dr. Joshi "must provide some representative examples of their alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors." Id. at 557.

In 2014, the Eighth Circuit again addressed the pleading requirement under Rule 9(b) for FCA claims. See generally United States ex rel. Thayer v. Planned Parenthood of the Heartland, 765 F.3d 914 (8th Cir. 2014). In *Thayer*, the relator, a center manager of Planned Parenthood clinics, alleged Planned Parenthood (1) filed reimbursement claims for birth control pills prescribed without examinations or not received by patients, (2) sought reimbursement for abortion-related services in violation of federal law and instructed patients who experienced abortion-related complications to give false information to medical professionals at other hospitals, causing those medical professionals to unknowingly file claims for services performed in connections with abortions, (3) sought reimbursement for services that had already been paid by 'donations' to Planned Parenthood; and (4) engaged in upcoding. Thayer, 765 F.3d at 915-16. Similar to the complaint in *Joshi*, Thayer's complaint did not identify representative examples of false claims submitted to the government for reimbursement. Id. at 916.

Planned Parenthood moved to dismiss the complaint, contending Thayer failed to allege fraud with the particularity required by Rule 9(b). To determine whether Thayer satisfied Rule 9(b), the Eighth Circuit addressed whether Thayer was required to plead "some representative examples" of the alleged fraudulent conduct as it had required in *Joshi*. In its analysis, the *Thayer* Court distinguished between the facts of *Joshi* and the facts presented in *Thayer*: Dr. Joshi did not have a direct connection to the hospital's billing department and he could only speculate that false claims were submitted; whereas, Thayer oversaw Planned Parenthood's clinics and was able to plead "personal, first-hand knowledge of Planned Parenthood's submission of false claims." Id.

at 917. Given these factual distinctions, the Court looked not only to its discussion in *Joshi*, but also to the Fifth Circuit's reasoning in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) to determine whether Thayer's complaint satisfied Rule 9(b).

In *Grubbs*, the plaintiff alleged that shortly after he commenced employment with a hospital, the chairman of the medical staff as well as another physician invited Dr. Grubbs to dinner. Over dinner, the chairman and other physician "divulged to him their fraudulent billing scheme and instructed him on how he was to contribute to the scheme." Grubbs, 565 F.3d at 184. In his complaint, Grubbs alleged the scheme related to weekend on-call shifts and that he was instructed to meet with the nursing staff and get updates, but to "see patients only 'as needed' or when something acute's going on' but bill every day as a regular 'face-to-face' hospital visit." Id. Dr. Grubbs alleged the nursing staff during his weekend on-call shift attempted to help him record his patient interactions as face to face even though they were based only on information obtained from nurses. Eventually, Dr. Grubbs filed suit as a relator against the hospital and several physicians, alleging violations of the FCA. Notably, the complaint included one allegation of a false bill submitted for reimbursement by each doctor. Id. at 185. Upon a motion to dismiss for failure to satisfy Rule 9(b), the district court dismissed Dr. Grubbs' complaint. On appeal, the Fifth Circuit was then asked to consider whether the district court erred in dismissing the complaint.

In *Grubbs*, the Fifth Circuit thoroughly analyzed how a plaintiff satisfies "the judicially-created" Rule 9(b) standard, namely that the plaintiff is to plead "the time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what the person obtained thereby." Id. at 186. The *Grubbs* Court considered that most courts asked to address FCA claims have been tasked with determining whether a plaintiff has a sufficient

claim pursuant to 31 U.S.C. § 3729(a)(1)(A):  Any person who "knowingly *presents*, or causes to be *presented*, a false or fraudulent claim for payment or approval is liable to the United States for a civil penalty."  Id. (emphasis added).  Courts have generally concluded the crux of subsection (a)(1)(A) is the "presentment requirement."  See e.g., United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah, 472 F.3d 702, 727 (10 Cir. 2006); United States ex rel. Clausen v. Laboratory Corporation of America, Inc., 290 F.3d 1301, 1311 (11th Cir. 2002).  However, the *Grubbs* Court noted different courts have articulated different degrees of specificity with which plaintiffs are required to plead the actual presentment of claims to the government in order to satisfy Rule 9(b).  To determine the degree of specificity with which Grubbs was required to plead the presentment of a claim, the Fifth Circuit specifically looked to the Eleventh Circuit's decisions in *United States ex rel. Clausen v. Laboratory Corporation of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002) and *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349 (11th Cir. 2005) ("*Walker*").  In *Clausen*, the Eleventh Circuit held:

> Rule 9(b)'s directive that 'the circumstances constituting fraud or mistake shall be stated with particularity' does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.

*Clausen*, 290 F.3d at 1311.  Instead, some indicia of reliability that a false claim for payment was submitted to the government must be presented in the complaint.  Id.  Specifically, the *Clausen* Court found the allegation that the scheme "resulted in submission of false claims for payment to the United States" insufficient to satisfy Rule 9(b), because the plaintiff did not include specific information of actual submitted claims, such as the amount of charges submitted for reimbursement, the dates that bills were submitted, or billing practices and policies.  Id. at 1312.  However, several years after the Eleventh Circuit's *Clausen* decision, in *Walker*, the Eleventh

Circuit concluded the particularity requirement of Rule 9(b) was satisfied when a nurse's allegations explained *why* she believed the clinic at which she worked submitted false claims. Walker, 433 F.3d at 1360. In *Walker*, the plaintiff nurse described the clinic's practice of billing services rendered by nurses effectively the same way as services rendered by physicians. Id. Consequently, despite the fact that the nurse's complaint did not contain the details of submitted claims, the Eleventh Circuit affirmed the district court's denial of a motion to dismiss.

In *Grubbs*, the Fifth Circuit interpreted the Eleventh Circuit's *Clausen* and *Walker* decisions to stand for the proposition that "in the face of strong evidence of a billing scheme in which it was likely, as opposed to speculative, that fraudulent bills were actually submitted, the court found relatively skimpy details about the bills to be sufficient." Grubbs, 565 F.3d at 188. Against this background, the Fifth Circuit in *Grubbs* formulated its Rule 9(b) pleading requirement applicable to section 3729(a)(1)(A) and determined Grubbs' claim under that section satisfied Rule 9(b). Considering section 3729(a)(1)(A) requires presentment of a false or fraudulent claim for payment, "[f]raudulent presentment requires proof only of the claim's falsity, not of its exact contents." Grubbs, 565 F.3d at 189. Thus, at the pleading stage, stating "with particularity the circumstances constituting fraud" does not require the plaintiff to necessarily state the contents of bills. See Fed. R. Civ. P. 9(b). Therefore, the Fifth Circuit held:

> to plead with particularly the circumstances constituting fraud for a False Claims Act § 3729(a)(1)[3] claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.

Grubbs, 565 F.3d at 190.

---

[3] With the passage of the Fraud Enforcement and Recovery Act of 2009, the FCA was renumbered and amended. See Pub. L. No. 111-21, § 4(a)(1), 123 Stat. 1617, 1621-22. As a result, former subsection (a)(1) was renumbered as (a)(1)(A) to section 3729.

Relying on the Fifth Circuit's *Grubbs* decision, in *Thayer*, the Eighth Circuit similarly concluded Rule 9(b) can be satisfied by alleging the particular details of a scheme to submit false claims "paired with reliable indicia that lead to a strong inference the claims were actually submitted." 765 F.3d at 918. However, the Eighth Circuit noted that when a relator's complaint lacks reliable indicia that claims were actually submitted, a relator should be required to plead representative examples of false claims. The Court ultimately concluded Thayer was not required to plead representative examples of false claims submitted for unnecessary birth control pills or birth control pills dispensed without examination and abortion related services because she plead details about Planned Parenthood's billing practices and personal knowledge that false claims were submitted, which was sufficiently reliable to indicate the claims were actually submitted. Id. at 919. However, the Eighth Circuit concluded Thayer's claims that Planned Parenthood violated the FCA by directing patients who received abortions to report to a local hospital, advise they had a miscarriage, and receive Medicare coverage if serious side effects occurred, did not satisfy Rule 9(b) because those claims lacked sufficient indicia of reliability and Thayer did not plead representative examples of the false claims. Thayer did not have personal knowledge of the billing systems of local hospitals to which patient may report; consequently "Thayer is only able to speculate that false claims were submitted by these hospitals." Id. at 920. The *Thayer* Court similarly concluded the allegations of "upcoding" did not satisfy Rule 9(b) because these allegations were conclusory and generalized – they did not enumerate "particular details of the scheme to submit false claims." Id.

In the case before the Court, Trinity Health contends the amended complaint should be dismissed because Dr. Benaissa has not met the heightened pleading requirement articulated in *Joshi* and *Thayer*. Specifically, according to Trinity Health, Dr. Benaissa has not identified a

single representative claim submitted to the government or pled reliable indicia that create a strong inference that false claims were submitted.  See Doc. No. 38, p. 2.

Dr. Benaissa asserts he sufficiently pled the who, what, when, and how of the scheme to satisfy Rule 9(b).  According to Dr. Benaissa, the Defendant overcompensated doctors for unnecessary procedures and engaged in upcoding, which violated Anti-Kickback and Stark statutes.  Consequently, since Trinity Health certified its compliance with Medicare/Medicaid regulations, including Anti-Kickback and Stark statutes, Dr. Benaissa contends all claims submitted for reimbursement were fraudulent or false under the FCA due to Trinity's non-compliance with Anti-Kickback and Stark statutes.

### C.    Dr. Benaissa's Claims

In his amended complaint, Dr. Benaissa brings eight separate causes of action again Trinity Health.  In addressing Trinity Health's motion to dismiss, the Court considers whether Dr. Beanaissa's complaint satisfies Rules 8 and 9(b) for each of those claims.  Because some of the causes of action are brought pursuant to the same subsection of 31 U.S.C. § 3729(a)(1), the Court consolidates its analyses for those causes of action.

### 1)    Counts 1 and 7:  31 U.S.C. § 3729(a)(1)(A)

Subsection (a)(1)(A) of 31 U.S.C. § 3729, imposes a civil penalty on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States Government.  31 U.S.C. § 3729(a)(1)(A).  A prima facie case under § 3729(a)(1)(A) requires that "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."

United States v. Basin Elec. Power Coop., 248 F.3d 781, 803 (8th Cir. 2001). The Eighth Circuit's analysis of whether a claim brought pursuant to 31 U.S.C. § 3729(a)(1)(A) satisfies Rule 9(b) hinges on whether a relator sufficiently alleges there is reliable indicia that claims were actually submitted to the government for reimbursement. See Thayer, 765 F.3d at 917-18. If the relator alleges reliable indicia that claims were actually submitted, the relator then only needs to allege particular details of a scheme to present such false claims to satisfy Rule 9(b). Id. at 918. Whereas, if a relator does not sufficiently allege reliable indicia that claims were actually submitted, the relator is then required to allege representative examples of fraudulent conduct to satisfy Rule 9(b). Id. Applying this standard to the allegations in the complaint, the Court concludes Dr. Benaissa's 262-paragraph complaint does not allege particular details of Trinity's Health's scheme to submit false claims for reimbursement to satisfy Rule 9(b).

Here, the Court is not convinced Dr. Benaissa sufficiently pled allegations amounting to reliable indicia that lead to a strong inference false claims were actually submitted. Of the 262-paragraph amended complaint, only five (5) allegations relate to Trinity Health's receipt of funds from federal healthcare programs:

> 91. Payments from the Medicare Program account for approximately 28-29 percent of Trinity's net revenues each year. Payments from the Medicaid Program account for another 6 percent of net revenues each year. In the past 6 years, Trinity has received payments from the Medicare Program in excess of $700 million.
> . . .
>
> 104. Trinity Health has knowingly and repeatedly violated Federal Stark and Anti-kickback laws discussed below and have knowingly submitted thousands of false claims to Federal Healthcare Pogroms which claims arose through tainted referrals from employed surgeons receiving excessive compensation from Trinity Health.
> . . .
>
> 141. Since 2010, Trinity Health has received massive revenues from the Medicare Program. Among Trinity's net revenues of approximately 450 million dollars each year, payments from the Medicare Program account for approximately 28-29

percent of such revenues. Payments from the Medicaid Program account for another 6 percent each year. In the past 6 years, Trinity has received payments from the Medicare Program in excess of 700 million dollars.

142. A significant portion of such revenues received by Trinity Health from the Medicare Program derived from inpatient and outpatient referrals by employed physicians receiving excessive compensation as described above.

143. Between 2010 and the present, Trinity Health has submitted thousands of claims both for specific serviced provided to Medicare beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

See Doc. No. 34, pp. 25, 28, and 40.

Dr. Benaissa generally alleges Trinity Health has received monies from federal healthcare programs. However, none of these allegations which outline Trinity Health's revenue from federal healthcare programs link revenue to Trinity Health's submission of claims for the alleged unnecessary surgeries or upcoding. No allegation affirmatively pleads Trinity Health actually submitted any claim; instead, the relator relies on the presumption Trinity Health must have submitted claims for the alleged fraudulent activity because Trinity Health received monies from federal healthcare programs.

In *Thayer*, the Eighth Circuit concluded Thayer's claims had sufficient indicia of reliability that claims were actually submitted when she alleged specific details about Planned Parenthood's billing practices as well as personal knowledge regarding the submission of claims. 765 F.3d at 919. Dr. Benaissa does not allege any personal knowledge of Trinity Health's billing practices or submission of claims. The Court does not require Dr. Benaissa to plead such personal knowledge of billing practices or claim submissions because the Court well understands physicians, compared with a hospital/clinic administrator or manager, may not be versed on internal billing systems or practices to plead such personal knowledge. However, the Court does require, as the Eighth Circuit did in *Thayer*, Dr. Benaissa to provide the underlying factual bases for his allegations claims were

submitted to the government for reimbursement. See id. at 919 (concluding Thayer's claims had "sufficient indicia of reliability because she provided the underlying factual bases for her allegations."). Dr. Benaissa's complaint does not satisfy this burden.

As the Court previously discussed, Dr. Benaissa's complaint contains only general allegations of the amounts received by Trinity Health from the Medicare and Medicaid Programs. See Doc. No. 34, pp. 25, 28, and 40. Dr. Benaissa's allegations do not link these reimbursements to the alleged unnecessary surgeries or upcoding by Trinity Health physicians. Dr. Benaissa's complaint does not allege, nor can the Court reasonably infer from Dr. Benaissa's allegations, Trinity Health submitted claims as a result of upcoding or unnecessary procedures for reimbursement. Consequently, the Court concludes Dr. Benaissa did not plead reliable indicia claims were actually submitted. The mere assertion here that there existed a fraudulent scheme which resulted in the submission of false claims in insufficient to satisfy Rule 9(b). Clausen, 290 F.3d at 1312. If the Court were to accept allegations that a hospital simply received reimbursement from federal healthcare programs, with nothing more, as "reliable indicia claims were actually submitted," a relator would then be alleviated from alleging representative examples of submitted claims pursuant to the Eighth Circuit's reasoning in Thayer and need only to allege particular details of a fraudulent scheme. Such a result would permit a relator to satisfy Rule 9(b) without pleading "presentment" of a fraudulent claim. This result is contrary to the unanimous conclusion "presentment" is a quint-essential element of a claim brought pursuant to Subsection (a)(1)(A). Grubbs, 565 F.3d at 186.

Concluding Dr. Benaissa's amended complaint does not contain reliable indicia that claims were actually submitted for reimbursement, Dr. Benaiss'a amended complaint can only survive a motion to dismiss if he pleads "at least some representative examples" of false claims. Joshi, 441

F.3d at 557; Thayer, 765 F.3d at 918-19. The FCA defines "claim" as "direct requests to the Government for payment." Universal Health Servs. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 1996, (2016) (citing 31 U.S.C. § 3729(b)(2)(A)). Based upon the Court's thorough review of the amended complaint, there are no allegations outlining any representative examples of false claims for payment submitted by Trinity Health to the government. In fact, the only allegations related to payment by the government for claims submitted generally allege the amounts received by Trinity Health from the Medicare and Medicaid Programs. See Doc. No. 34, p. 25. Dr. Benaissa certainly did not plead representative examples of false bills submitted to the government. Instead of identifying representative examples of false claims submitted for reimbursement, Dr. Benaissa alleges Trinity submitted false certifications of compliance with Anti-kickback and Stark statutes. Specifically, Dr. Benaissa contends he sufficiently alleges Trinity Health submitted several documents to the government in which it falsely certified Trinity Health was in compliance with Anti-kickback and Stark statutes:

1) Beginning in 2010, Trinity Health submitted annual cost reports to the government in which it certified Trinity Health complied with AKS and Stark Law. See Doc. No. 34, ¶¶ 152-153, 156-161.

2) Trinity Health entered into provider agreements in which Trinity Health certified it has complied with Anti-Kickback and Stark statutes. See Doc. No. 34, ¶ 148.

3) Trinity Health "impliedly certified" its compliance with AKS and Stark Law by submitting CMS-1500 forms and other forms seeking reimbursement. See Doc. No. 34, ¶¶ 166, 203, 207.

Consequently, Dr. Benaissa maintains he has:

alleged a scheme that affects every single claim for payment for hospital or physician services for patients treated by five particular physicians. The Amended Complaint also establishes that Defendants collect approximately $157.5 million each year in payments from the government. These two facts combined 'lead to a strong inference that claims were actually submitted.'

See Doc. No. 39, p. 16 (citing Thayer, 765 F.3d at 918). Dr. Benaissa's claims essentially rest upon the theory that the false certifications regarding Trinity Health's violations of Anti-Kickback and Stark statutes impliedly cause all claims for reimbursement to be false. Therefore, according to Dr. Benaissa, each claim for reimbursement submitted to the government was false.

In *Universal Health Services v. United States ex rel. Escobar*, the Supreme Court addressed whether FCA liability can attach to reimbursement claims submitted to Medicaid for services actually provided when the claims "failed to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements" for such services. 136 S. Ct. 1989, 1997 (2016). In reaching its decision, the Supreme Court endorsed a theory of FCA liability based upon "implied false certifications." The Supreme Court concluded a claim for payment is "false or fraudulent" for purposes of the FCA, specifically section 31 U.S.C. § 3729(a)(1)(A), when a defendant "submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." Id. at 1995. Liability under the FCA can attach to such a representation when the misrepresentation was "material to the government's payment decision." Id. at 1996. A false statement is material to the government's payment decision when either "(1) a reasonable person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it." United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 503-4 (8th Cir. 2016). Several courts have concluded compliance with AKS is material to the Government's payment decision and non-compliance with AKS can trigger

FCA liability.  U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 392-93 (1st Cir. 2011); United States ex rel. Lutz v. Berkeley Heartlab, Inc., No. 9:14-230-RMG, 2017 WL 6015574, at *6-8 (D. S.C. December 4, 2017).  See United States ex rel Cairns v. D.S. Med., LLC, No. 1:12-cv-004, 2017 U.S. Dist. LEXIS 140628, at *9 (E.D. Mo., Aug 31, 2017) (citing cases). This conclusion is reinforced by AKS's statutory language clearly outlining that a claim that includes items or services "resulting from a violation of this section constitutes a *false or fraudulent* claim" under the FCA.  42 U.S.C. § 1320a-7b(g) (emphasis added).[4]

It is clear a plaintiff may bring an actionable claim under the FCA upon the theory that certifications that falsely attest to compliance with the Anti-Kickback statute give rise to FCA liability.  In the complaint, Dr. Benaissa identifies various categories of certificates, cost reports, and forms submitted by Trinity Health pursuant to its participation in the Medicare and Medicaid programs in which Trinity Health attests to its compliance with Anti-Kickback and Stark statutes. The allegations generally imply Trinity Health submitted these certificates, cost reports, and forms because there exists a statutory requirement to do so.  Dr. Benaissa alleges these certificates, cost reports, and forms were false because Trinity Health was not in compliance with Anti-Kickback and Stark statutes.  These allegations do not allege specific agents of Trinity Health attested to compliance with Anti-Kickback and Stark statutes or that specific agents submitted these certificates, cost reports, and forms on behalf of Trinity Health.  These allegations do not allege the dates these certificates, cost reports, and forms were submitted.  Nonetheless, according to Dr. Benaissa's theory of FCA liability, because these cost reports, forms, and certificates falsely

---

[4] At this juncture, the Court need not decide whether an implied certification theory can give rise to FCA liability when certificates, cost reports, or forms falsely certify compliance with the Stark statute.

certified compliance with Anti-Kickback and Stark statutes, every claim for payment submitted by Trinity Health to the Government was false.

Without a doubt, FCA liability can arise due to an implied false certification. However, a healthcare provider's violation of government regulations or engagement in fraudulent schemes does not impose liability under the FCA unless the provider submits false or fraudulent claims to the government for payment based on these wrongful activities. See United State ex rel. Vigil v. Nelnet, Inc., 639 F.3d 791, 799 (8th Cir. 2011)(noting that "merely alleging *why* the [c]ertifications were false" was insufficient to state a claim under 3729(a)(1))(emphasis in the original); Clausen, 290 F.3d at 1311 ("Without the *presentment* of [a false or fraudulent] claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act.")(emphasis in the original). Consequently, a relator must still satisfy Rule 9(b) and adequately allege either reliable indicia claims were actually submitted or representative examples of submitted claims. In other words, a relator cannot circumvent the pleading requirements of Rule 9(b) by proceeding under an implied false certification theory of liability. Here, as discussed previously, Dr. Benaissa has failed to plead any representative examples of claims for reimbursement submitted by Trinity Health or to plead reliable indicia claims were actually submitted. Regardless of the theory of liability upon which Dr. Benaissa seeks to recover damages under the FCA, presentment must be alleged with particularity pursuant to Rule 9(b). Because the Court concludes Dr. Benaissa's complaint fails to allege either reliable indicia claims were actually submitted or representative examples of submitted claims to comply with Rules 8 and 9(b), the Court dismisses Counts 1 and 7 alleging violations of 31 U.S.C. § 3729(a)(1)(A).

The Court notes that to the extent Dr. Benaissa contends the certificates, cost reports, and forms are themselves representative "claims" submitted the Court rejects such an argument. In relevant part, 31 U.S.C. § 3729(b)(2) defines a "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property. . . ." Under the plain language of Section 3729(b)(2), the cost certificates, cost reports, and forms submitted by Trinity are not "claims" presented to the Government for payment. See 31 U.S.C. §§ 3729(a)(1)(A) and (b)(2). Moreover, even if the Court were to construe these certificates, cost reports, and forms as "claims" for the purpose of the FCA, Dr. Benaissa's complaint wholly lacks detailed allegations regarding certificates, cost reports, and forms to satisfy the heightened pleading requirement of Rule 9(b).

### 2) Counts 2 and 4:  31 U.S.C. § 3729(a)(1)(B)

The Court next turns to Dr. Benaissa's claims Trinity Health violated 31 U.S.C. § 3729(a)(1)(B). A person is liable under 31 U.S.C. § 3729(a)(1)(B) when such person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Dr. Benaissa alleges Trinity Health violated Section 3729(a)(1)(B) by making false certifications in costs reports and forms submitted to the government. In its motion to dismiss, Trinity Health contends the amended complaint "provides no factual details that support a claim under § 3729(a)(1)(B) as required by Rule 9(b)." See Doc. No. 38, p. 28.

The Eighth Circuit applies the heightened pleading requirement of Rule 9(b) to Section 3729(a)(1)(B) claims. See Olson v. Fairview Health Servs. of Minn., 831 F.3d 1063, 1072 (8th Cir. 2016). And, unlike Section 3729(a)(1)(A), the "presentment" requirement is absent from Section 3729(a)(1)(B). Grubbs, 565 F.3d at 192-93. Instead, for a Section 3729(a)(1)(B) claim, a

plaintiff must allege with particularity that: (1) the defendant made, or caused another to make, a false or fraudulent record or statement, (2) the defendant knew the record or statement was false or fraudulent, and (3) it was material to the claim. <u>United States ex rel Pervez v. Beth Isr. Med. Ctr.</u>, 736 F. Supp 2d 804, 811 (S.D.N.Y. 2010).

In the amended complaint, Dr. Benaissa specifically alleges "Trinity Health knowingly made, used, or caused to be made or used, false records and statements, i.e. the false certifications made by Trinity Health in submitting their Cost Reports after each fiscal year to get false [claims] paid or approved by the United States." <u>See</u> Doc. No. 34, p. 59. Dr. Benaissa alleges the records falsely attested to Trinity Health's compliance with Anti-Kickback and Stark statutes. To support his claims brought pursuant to Section 3729(a)(1)(B), Dr. Benaissa relies on the allegations relating Trinity Health's submission of false certificates, cost reports, and forms in accordance with statutory regulations.

Although, Dr. Benaissa alleges the certificates, cost reports, and forms were false because Trinity Health was not in compliance with Anti-Kickback and Stark statutes, the allegations lack particularity regarding the making, use, or submission of these false reports. The allegations do not allege specific agents of Trinity Health attested to compliance with Anti-Kickback and Stark statutes or that specific agents submitted these certificates, cost reports, and forms on behalf of Trinity Health. As the Court previously discussed, the amended complaint merely infers Trinity Health submitted these certificates, cost reports, and forms because there exists a statutory requirement to do so. The allegations do not contain any details relating to the making, using, or submitting of certificates, cost reports, or other statutorily required forms as "false records." The allegations of the amended complaint are generalized and conclusory; Dr. Benaissa does not plead the making of any "false record or statement" with particularity. "Merely alleging *why the*

[c]ertifications were false is insufficient." <u>United States ex rel Vigil v. Nelnet, Inc.</u>, 639 F.3d 791, 799 (8th Cir. 2011). Thus, the amended complaint fails to plead with particularity any cause of action arising under Section 3729(a)(1)(B) as required by Rule 9(b). <u>Id.</u> Therefore, the Court dismisses Counts 2 and 4 alleging violations of 31 U.S.C. § 3729(a)(1)(B).

### 3) <u>Counts 5 and 6: 31 U.S.C. § 3729(a)(1)(G)</u>

Section 3729(a)(1)(G) provides for recovery from someone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). This provision is "the so-called reverse false-claims provision of the FCA." <u>Olson</u>, 831 F.3d at 1072-73. To be successful as to his claims made pursuant to Section 3729(a)(1)(G), Dr. Benaissa must allege Trinity Health owed to the government an "obligation," defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The Eighth Circuit has concluded the heightened pleading requirement of Rule 9(b) applies to claims brought pursuant to Section 3729(a)(1)(G) just as it does to claims brought under other subsections of 31 U.S.C. § 3729(a)(1). <u>Olson</u>, 831 F.3d at 1074. The *Olson* Court further concluded that if there is insufficient allegations of fraudulent conduct under the FCA, there can be no reverse liability under Section 3729(a)(1)(G). Consequently, because the Court has already concluded Dr. Benaissa's allegations to support his claims made pursuant to subsections (a)(1)(A) and (a)(1)(B) are insufficient, the Court must dismiss Dr. Benaissa's claims under subsection (a)(1)(G).

### 4) Count 7: 31 U.S.C. § 3730(h)

Dr. Benaissa's last cause of action is for retaliatory relief under 31 U.S.C. § 3730(h).

Section 3730(h) provides

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter

31 U.S.C. § 3730(h). In order to prove retaliation under Section 3730(h), a plaintiff must prove "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." Schuhardt v. Washington Univ., 390 F.3d 563, 566 (8th Cir. 2004). For an employee's conduct to be construed as "protected activity," the activity must be in furtherance of an FCA action and "aimed at matters which are calculated, or reasonably could lead, to a viable FCA action." Id. at 567. This second condition has been explained by the Eighth Circuit to mean that "[a]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." Wilkins v. St. Louis Hous. Auth., 314 F.3d 927, 932-33 (8th Cir. 2002). The plaintiff is not required to have filed an FCA action at the time of the alleged retaliation. Id. (citing United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 236 (1st Cir. 2004).

In the amended complaint, Dr. Benaissa specifically alleges the following regarding his termination from Trinity Health:

49. At this meeting on March 5, 2015, Dr. Kindy indicated that a nurse reported that Dr. Benaissa somehow behaved "unprofessionally" by disagreeing with another physician about whether the patient needed blood transfusions before surgery. That nurse was Dr. Joshi's girlfriend.

50. At the meeting, Mr. Warsocki stated, "we visited with John Kutch [Trinity's CEO] and the Board. Trinity will not be renewing your contract." Mr. Warsocki then stated, "Dr. Benaissa you are a good doctor and I respect what you have done for the hospital. This has nothing to do with you as a doctor."

51. Upon leaving Trinity, Dr. Benaissa received numerous letters, references, e-mails, and recommendations from Trinity physicians and nurses with whom he worked who praised his skill, compassion, and professionalism as a surgeon.

52. Trinity terminated Dr. Benaissa because he challenged and exposed Trinity's scheme of paying employed surgeons based on the volume and value of referrals by such surgeons to the hospital system. The scheme was so mutually lucrative that Dr. Joshi and other clinicians were incentivized to order and perform unnecessary surgeries on patients, including a significant population of elderly patients insured by the Medicare Program.

See Doc. No. 34, pp. 13-14. Dr. Benaissa also alleges he notified or discussed his concern regarding unnecessary surgeries with Trinity Health's administration on multiple occasions. However, there is no allegation in the amended complaint that Dr. Benaissa discussed, complained, or notified Trinity Health that he believed Trinity Health was committing fraud against the government. The Court does not construe Dr. Benaissa's action in voicing his concern that physicians were performing unnecessary surgeries as "protected activity." Further, Dr. Benaissa's allegations he shared with Trinity Health administration his concerns regarding unnecessary surgeries do not sufficiently allege Trinity Health "knew" of any protected activity in which Dr. Benaissa engaged. At this stage, accepting the allegations of the complaint as true, Dr. Benaissa has failed to state a claim for retaliation under Section 3730(h).

**D.**      **Request to Amend the Complaint**

In his response to Trinity Health's motion to dismiss, Dr. Benaissa requests the Court grant him leave to file a second amended complaint or dismiss the amended complaint without prejudice should the Court grant Trinity Health's motion.  The Court declines to permit Dr. Benaissa leave to file a second amended complaint or dismiss the amended complaint without prejudice.  Dr. Benaissa did not submit for the Court's review a proposed second amended complaint.  The Court also does not believe a second amended complaint would cure the deficiencies of the amended complaint.

**IV.**      **CONCLUSION**

For the reasons set forth above, the Court **GRANTS** the "Defendants' Motion to Dismiss Relator's Amended Complaint" (Doc. No. 37) and dismisses the Plaintiff's amended complaint (Doc. No. 34).  The Court **FINDS AS MOOT** the request for a hearing (Doc. No. 42).

**IT IS SO ORDERED.**

Dated this 31st day of December, 2018.

*/s/  Daniel L. Hovland*                                    
Daniel L. Hovland, Chief Judge
United States District Court